Next we have T D X Energy v. Chesapeake Operating, Inc. And first we hear from Mr. Sinclair. Good morning. My name is Scott Sinclair. I represent T D X Energy. Before we get started, a couple of things. I gave the clerk copies of the statute that is at issue here, 103.1. So I wanted to make sure in 103.2 I wanted to make sure that you had those. And then secondly, I'd like to update you on the state court proceeding that is tracking along and raises and deals with the identical issue that we have dealt with. That case is the 21 Oil and Gas Corp. v. Hill Corp. And the Third Circuit, the Louisiana Third Circuit, ruled favorably to T D X Energy, said that this statute does apply to mineral lessees. That ruling came down in September, I believe. In November of last year, the Third Circuit denied rehearing on that case. And then in December of last year, Hill Corp., the losing party, applied for writs to the Louisiana Supreme Court. And the writ application has been briefed. And as of yesterday, as far as I know, and I checked with Mr. Ottinger, he's involved in that case, the Louisiana Supreme Court has not decided whether or not to grant writs. Should we wait to see if they do? Well, if I were in your position, obviously what I think I would do is I would take there's some other issues in that case where they may not reach this ultimate issue because there's a race judicata issue as to whether or not that was decided in the 2013 Court of Appeal decision. And so that particular issue may not make it to the Supreme Court. If I were in your shoes, I would take this argument. I would talk about how I would plan to rule in this case. And then I would wait to see if the Supreme Court accepts writs. And obviously if they do, and if they do— How long does that usually take? Well, that's a good question. I would expect it to be within 60 to 90 days, but I really don't know. And I think it can vary. But I wanted to make sure that you're aware of that because this is an eerie case and how our Supreme Court rules on these issues would obviously be pertinent. What if they don't take that case, they deny review? We can always seek certification to a state Supreme Court. Would that be advisable in this case? I don't think so. And the reason I don't think so is because if they don't take this, if they deny writs, that tells you that this is not all that interesting to them, it ought to tell you that they think that the Court of Appeal got it right and also because of the history of this in our Courts of Appeal, since for the last 40 years Louisiana appellate courts have taken the position that this statute applies to people like TDX, people who have a mineral lease. The Scurlock case and the Genmar case both dealt with cases where a mineral lease holder was the party in TDX's shoes. Now, it wasn't questioned in those cases, but that's sort of the point. It wasn't questioned in those cases. So I think it was obvious to everyone that this statute does apply to folks like TDX. And the Third Circuit didn't get into a text there, the core textual argument that they're making, did it? In other words, it didn't try to explain how one, you can read sort of unleased interest to include leased interest. It did in a couple of different ways. It's got a history in the other case, in the 21 oil and gas case. It first was presented to the trial court on an exception of no cause of action. The trial court, this is Hill Court, the trial court rejected that exception, and they took that up on a writ application, not an appeal, but a writ application. And in the writ application, three judges of the Court of Appeal specifically said no, and they further went on to say, and we find no reversible error. It's still a writ application, and it's still not binding law. But nevertheless, you've got a clear indication that those three judges said, we don't see a problem with this. And they were informed of this district magistrate judge's opinion, district court's opinion? No. I don't think that's. I'm sorry. I misunderstood your question. I don't think so. Okay. I don't think our magistrate, that was in 2013, and I don't think our magistrate judge had made her decision yet by that. I'm sorry. But then when it went back up. Correct. They did acknowledge and say we disagree. They did. And the basis for the most current appeal is in part the TDX case. And they're saying that the federal court in the western district ruled against TDX, and it is clearly at issue now. And the Third Circuit clearly not only said, do we think we decided that issue back in 2013, but they also said in a belt-and-suspenders way that courts often do, even if it's still a live issue, we still think we maintain our position. Exactly. Exactly. But you say that answers the eerie guess. Well, it does because you've got a line of cases by courts of appeal. My only point, though, was it isn't developed analysis of the textual point that the western district turned on. So if we just look at the text itself, is there, well, let's not look at the text. Is there any legislative intent behind what was meant by that phrase? No. Not that I'm aware of. Not that anyone has come up with, and the district court said that there was no evidence of legislative intent, and that's correct. But I do think, and the reason that I would suggest that you proceed on and consider this case regardless of what, even before we know what the Supreme Court will do is because I do think it's very clear. If you start, as we have said, the place to start is at the beginning. In any set of statutory schemes, lots of times you're going to find definitions, pure definitions in a statutory scheme, and they're early on. And so if you start at the end, you might miss the benefit of those definitions. In our case, there is a clear definitional framework that is established early on. And if you start at the end, you're going to miss that definitional framework. 103.1a refers to the owners of said interest. It does. But it, but that's the first time the word interest is used. So where do we find what it means by interest? Actually, it's not. The first time it's used is in the title of the statute. The title of the statute is 103.1, Operators and Producers to Report to Owners of Unleased Oil and Gas Interests. Okay? So the title begins and tells you we're talking about oil and gas interests here, and we're talking about unleased oil and gas interest. Then when you get down into Section A, the very first section, the very first sentence, it gives you the definitional framework for that, and it says we're talking about unleased interest upon which the operator or producer has no valid oil, gas, or mineral lease. And so when you read in the next clause where it says the owner of said interest, it can only be referring up, what's above it, not what's below it. And so it obviously means an interest upon which the operator has no valid lease. So is the title of a statute given some authority as opposed to the actual language of the statute? I mean, who made the title, I guess? Was that part of the actual regulation or statute that was passed, or did someone else come and add the title afterwards? What authority does this Court or does the Court give to a title of a regulation or a statute? And I'm not really arguing, I understand the issue about titles and whether or not they're part of the law. But my point is, is it consistent with the law? And it's consistent with the interpretation that I've given you. And so this word interest doesn't just appear out of thin air that you see in the bottom part of Section A. And it's clear throughout the statute when you read it, it's clear that we're talking about oil and gas interest. There's no doubt about that. We're not talking about surface leases. We're not talking about timber deeds. We're talking about oil and gas leases or interest. And so that word is not really, shouldn't lead to any confusion. What is very clear, and what none of Judge Hayes' memorandum ruling nor Chesapeake's briefs do for you is tell you what do you do with the language that says upon which the operator or producer has no valid oil, gas, or mineral lease. Judge Hayes referred to it and then never gave it any explanation, never gave it any effect. Chesapeake has done the same thing. If you read those words out of this statute, then you get to go with Chesapeake's position. The Louisiana Supreme Court has said that you do not read words out of a statute. You give every word some effect if you can do that. And the only way to do that is to give some effect to this clause when it says that what we're talking about from the get-go is lands upon which the operator or producer has no valid lease. Does that include TDX? Yes. There's 62 acres of land in this unit upon which Chesapeake has no valid lease. TDX does. Therefore, TDX is entitled to the reports under this statute. Did TDX request these reports and they were not given? Was TDX ever given a reason why they were not given? My recollection is not until we filed suit. But we requested the reports, I think, in a December letter. We again requested them. We gave them notice that they had not complied with the obligation in a January letter, and I don't believe we ever got a formal response to any of those requests. They were simply ignored until we got to court. Even if you're right on the accounting reports owed, what about what I think of as the windfall problem in Section 10, that by virtue of not recording, your position is they don't owe any money towards the risk of drilling? I'm not sure I'm following your question. We're now in Section 10? Yeah. If you could just move to your argument in Section 10. Yeah. The Section 10 argument is that Section 10 provides a framework. Our basic argument is that Judge Hayes got it right. But, Judge, Article 10 or Section 10 does provide a framework for providing notice so that you can give somebody notice that you're going to drill a well or that you're drilling a well, and that party has to respond within a certain period of time. If they don't respond, they're treated as if they went non-consent, and a penalty, a risk fee, applies to that. But the point of the ruling below means TDX wasn't faced with the risk fee. They would still owe cost, but for this separate reporting issue. Correct. Correct. Owing. It doesn't get you out of owing the cost. You just don't pay the penalty, which is three times triple cost, essentially. Yes. Section 10 does not get us out from paying the cost. 103.1 does. That's the penalty. But by not recording, you got out from the penalty. I'm sorry? By not recording, you got out from the penalty that Section 10. This is the recording. I wouldn't characterize it that way. It's not like there's no evidence that anybody sat back and waited until they completed the well and then started recording leases. They started taking leases until the day before the well was completed. The first lease was taken on July 18th. The well was completed on July 19th. You're challenging that maybe there was something nefarious about it, but the ruling below meant your client didn't have to pay the risk fee penalty. Correct. And we obviously agree with that, and we agree with that for the reasons that the court below said. Number one is that the language in that statute, when it says drilling, it means present tense, and when it says intends to drill, it means future tense. And what they excluded was past tense because it doesn't say what you have drilled. How does the system protect against or resist the amendments people that would sit and not record until after the drill is complete? If that happens, which is what happens here, the operator goes into everything with his eyes wide open. He knows exactly what's happening. He knows that he's got out of a 640-acre unit, he knows that he's missing 62 acres because he doesn't have them under lease. And he knows when he spuds that well, I'm doing it with the risk that I'm going to have to pay the entire cost of this because as far as he's concerned, it's an unleased interest. And unleased interests are never subject to the risk fee in Section 10. So when he spuds that well, he does it expecting to pay for that interest and only be able to recover one time that cost out of the proceeds. That's his full expectation. So he's not misled. He's not tricked into anything. He knows exactly what he's doing, and he makes his own choice. And he gets to deal with the consequences, whatever they are. So that's my answer to that. I understand that. Go ahead. If a well is drilled and it's completed and it's successful, is there still a risk factor? I mean, there's no risk involved anymore because it's producing oil. Is there still a risk factor? I'm not sure I understand. Well, there is still a risk because the well may pay out. It may not pay out twice. It may not pay out three times. And so under the risk fee, the well essentially has to pay out three times before the non-participating owner comes back in. Does that answer your question? And so under the new amendment, I mean, it's been changed twice since the provision that we're dealing with. Section 10. Which may support the ruling below because it shows they were trying to fix this problem. But today, would you agree, TDX in this situation, today they could send the notice after the lease was recorded and you'd have to make a risk fee choice? Correct. Yes, sir. And since it was past drilling, I think this was your last answer, and you're getting all the data, right? They have to send the data to you? Well, they've sent nothing to us. No, but under the statute, aren't they required when they say do you want to elect the risk fee, they have to send you any data they have up to that point, don't they? Correct. They did not do that. Right. But I'm saying it's a hypothetical situation. Correct. And the drilling has already been in the past. You're going to have a pretty good idea, aren't you, of whether it's worth making an election at that point under the new statute? Absolutely. And so I'm not here to quarrel with the new statute. I'm here to try to enforce our rights under the old statute. And I do agree with you, the fact that they changed the statute and first went in our direction. The first time they made the change, they didn't include past tense, and they specifically said that the notice has to go out before the well is fudged. And then they came back and made another change. So what you're really talking about is who's got political power in Baton Rouge? And then they come back and they changed it again and said, we're now going to allow you to send a notice out even after you drill the well. So it is what it is. If anything, for our purposes, what this is telling you is that temporal verbs have meaning. They had in our case, they had in the second amendment of Article 10, and they have in the current version of Article 10. All three tenses are used, and it's meaningful. Thank you. I've got 37 seconds left, and I don't have anything to add, so I'll turn it over. We'll take it. Mr. Uttinger. Good morning, Your Honors. May it please the Court, I'm Pat Uttinger from Lafayette representing Chesapeake in this matter. I would like to start on the Hillcorp case alluded to by counsel, XXI. Strangely, it's called that instead of 21, but be as may. My firm filed a writ application in that case. We did not try the case. We did not handle it at the Third Circuit Court of Appeals. But after that ruling, Hillcorp engaged us to prosecute a writ application. It's pending since early December. It's been fully briefed. We just simply don't know what will happen. I do make the point that it's not final. We think we put forth in that writ application a very compelling case as to why the Third Circuit did not get the issue correctly. I think Judge's, Magistrate Judge Hayes' decision was very cogent, very thorough. The decision at the Third Circuit was very matter-of-fact and very superficial, we feel. Roberts. Your analysis in the writ to the Louisiana Supreme Court basically tracks the reasoning of Magistrate Judge Hayes? Yes. And other arguments as well. But fundamentally, we do. If the Supreme Court doesn't take the case, and so we're left with this lower Federal court ruling and this Louisiana intermediate court ruling, under Erie, don't we generally have to defer to the Louisiana appellate court ruling, whether it's right or wrong? I think that — As an indication of Louisiana law? I believe Erie would lead the Court to look to a Supreme Court decision which doesn't exist. There are conflicts in the courts of appeal in Louisiana alluded to as a case called Cash, K-A-S-H. I handled that case a number of years ago, and the Third Circuit ruled differently than they did in this case. So it's far from clear. Well, they just denied the writ. They just denied it. They denied writs in both. That's correct. And here we do have, do they acknowledge the ruling below in this case, and they say then we maintain our position, et cetera? Correct. Well, again, I did not handle the case of the Third Circuit, but then counsel did call to the Third Circuit's decision, attention rather, this case by Judge Hayes, but they said we're not bound by Federal decision. But then in the next breath, they did rely on another Federal case that I was involved in called Adams. So a little inconsistency there. But also mentioned by counsel were two cases, Ginmore and Scurlock. The issue was simply not raised there. These are rather old cases, and the courts denied relief. So it cannot be said that those cases stand for the proposition that a lessee has standing under it. On the XXI case, which is the subject of the writ application to the Supreme Court, Professor Pat Morton, one of the leading commentators, criticized it and called it problematic. So we feel that that case will run its course. But back to this case, if you will. This case does involve two. I think I remember. In your table of authorities, is that Scholar's article or the context in which he criticized, is that referred to in your brief? It is not because this case was briefed long before the Third Circuit decided in XXI. We can provide that under Rule 28 if the court would like. But it's not in this case because the XXI case. Right, but you both sent 28J letters. It's not in that either. I have it. Correct. It was a law review article? It is not in my 28J letter. That's correct. But it's his treatise on compulsory immunization. But, Your Honors, this case does involve two distinct mutually exclusive statutes, 30-10, which is the framework, probably the most important part of the Conservation Act, the framework that regulates the relationship between an operator, such as Chesapeake, and a lessee, such as TDX. The well-cost reporting statute is in a different section. It deals, and of course that is admittedly the issue, with, to quote the statute, owners of unleased oil or gas interest. If I may respond to Judge Prado on the issue of the title, the title is part of the adopted legislation. I don't have it at my fingertips, but in early, in revised statutes 1 through 10, there are some very short statutory construction articles, and they say that the title is just for the convenience and it's not part of the law per se. But being that, as it may, it does allude to the owner of an unleased oil and gas interest. These two statutes, one regulating the relationship with a true lessee like TDX, the other dealing with unleased owners, create unique relationships and have unique rights and obligations under them. The argument advanced by TDX under the circumstance that it did not file its mineral leases for a period of time so that in the face of the public records Chesapeake thought it was unleased, it could not then invoke the risk fee because the Risk Fee Act clearly says it does not apply to an unleased owner. But when they recorded it, it promptly did. And on one other point, Chesapeake did provide the information alluded to. That's noted by Judge Hayes in paragraph 8 where she sets forth the facts, page 6 of her ruling. In a January 23, 2012 letter, Chesapeake provided TDX with its cost to drill the well, an affidavit supported it, and it invoked the risk fee at that point. So Chesapeake did, in fact, give them. You know this area very well, obviously, but step me back just a little bit. There's no definitional, statutory definitional term for unleased interests, and neither side, as opposing counsel said, has found any legislative history that's relevant to that. Is that fair to say? I would be fair to say. I have cases, but I don't know. So then from a simpler mind on these issues like mine, what would be the logic to give owners more protection than lessees? And I know your argument is just plain text statute, but take me into that. There is an understanding in the industry that the well cost reporting statute was adopted to address the circumstance where a truly unleased mineral owner is by definition unsophisticated. Whereas a mineral lessee doesn't inadvertently or accidentally come into the industry, they consciously buy a lease and have responsibilities. An oil company such as TDX has a staff of engineers, land men, accountants, and whatever, but a mom and pop land owner being unsophisticated is providing. The owner is unsophisticated, just owns land. Lessees are sophisticated. That's the point I make. But further than that, it's well established under Louisiana law that an unleased owner, an unleased owner of an oil and gas interest, obtains no revenue from a producing well until the operator has recovered the costs allocable to that interest. The unleased owner, I would call them unsophisticated, has no means to know when that occurs. This statute is an attempt to give them the mechanism, if they're truly unleased, to call upon the operator to provide not only the well cost information, but what's called sworn detailed itemized statement. This allows the unleased owner to be able to measure and mark and determine when they might come into production. An oil company has the greater level of sophistication because it generally has a staff or consultants who would speak to this information. There's still an information asymmetry if you're not the producer. Why wouldn't TDX still have a desire to see an accounting of these costs and to get these reports? In fact, because they actually know, are sophisticated about the industry, that report might have more meaning to them. Well, the question brings us back to 30 colon 10, not 103.1. There is a provision that if they don't like the cost, they're normally shared, and many times the company such as TDX will enter into an agreement, an operating agreement, a form out. That did not happen here. But if they don't like the cost, they have the right under 30 colon 10 to call for a hearing to fix well costs before the Commission of Conservation. That's in the text of 30 colon 10. So they do have a statutory remedy, if you will, to seek a hearing to call for a determination by the Commissioner. Now, they do have a right to these reports? Do they have a right to these reports? Not in the contemplation of 103.1 because our position is that it doesn't apply to a lessee, and that's the subject of pending writ application. But my point is that it's common that they will ask for the information from the operator. There's no obligation to provide it, but they do have the right to go to the Commissioner and the Commissioner can force the information to be provided. So if you don't give it to them, it's not like you forfeit your right to demand? That's correct. Sure. That's correct. That is correct. I would also, and we cited in brief, an associated statute, 30 colon 111. Essentially, the argument by TDX is the words owner of an unleased oil and gas interest includes a mineral lessee. I think that's the exact opposite of what is meant by an unleased interest. But if that were correct, then 30 colon 111 says owners of unleased mineral interest and lessees, and lessees in a drilling unit authorized by the Commissioner shall not be liable for cost above the market value. Those words would be unnecessary in 30 colon 111 if, as contended by TDX, the owner of an unleased oil and gas interest includes a lessee. Speaking of unnecessary words, what effect does your argument give to the language in 103.1, that phrase upon which the operator has no valid lease? Well, the words that follow that alluded to by counsel, owners of said interest, said means the previous characterization, which are lands, lands on which the operator has no interest. More important, so. So assuming you're right about that, why does the statute need to say what's the effect upon which the operator has no lease? Well, the only explanation I have, no one's arguing that the statute is terribly artful necessarily, but there are five other iterations in the statute that call that owner of the unleased interest. And so, and in fact, the penalty under 103.2 only mentions a penalty being due to the owner of an unleased oil and gas interest. It is true that Chesapeake has no lease on the lands, but more prevailing throughout the entire statute and Judge Hayes took this square on, is the reference to owner of said interest or owner of the unleased interest. Is the record silent as to why Chesapeake didn't obtain the leases itself for the 62 unleased units? It is silent on that, Your Honor. There's no reference, there's nothing in the record to explain why they didn't take the leases. There might have been, I'd be surmised, I might be wrong. My only other question factually, I guess, is assume if TDX had recorded immediately, wouldn't they still have been, wouldn't that recordation have been after the drill was complete? Yes. So they didn't, they couldn't, they weren't gaining the system at all, right? This is the loophole that the legislature chose to tie up, right? Well, I'm not sure if they're gaining, I'm not sure what their motivation is. I'm guessing that they wouldn't have been able to have gotten notice to participate in costs and risk regardless. Correct. Because the notice under 30.10 does not go to an unleased owner. But it was an unleased owner until the lease was recorded, but the will had been completed by then. So the statute, you know, I would suggest that the court has the authority under Article IV of the Civil Code to do the right thing. The right thing is to basically do what the legislature now has done. Correct. Correct. And the temporal feature is spelled out, and, of course, we do like Judge Hayes' decision, the well cost statute, and we have less enthusiasm about another ruling. But the reality is there is language in there that we think recognizes that the notice can be invoked after the well has been drilled, alluding to information. To your point of equity, if they didn't do any, if they didn't gain the system, which it seems like you conceded, why should they pay this fee that's triple cost, this risk fee penalty? What's the equitable argument for that? The equitable argument is that, I mean, there's a, and I'm answering your question without accusing TDX, if there's a saying in the industry, you know, hiding behind the log and everything, standing back and doing what's called a watchful wait while a company is spending this money and then announcing themselves when it's too late to invoke the statute. That would touchstone more than TDX. Well, touchstone is a leasing agent, as I understand, for TDX. It's not a third oil company, per se. It's a brokerage firm that buys the leases. This Court, I interrupted you. I'm sorry. Go ahead. In the Browning case, which was affirmed by this Court, it's cited in our brief, alludes to 103.2 as requiring the operator of a unit well, which includes unleased lands. The TDX leases are not unleased lands. They're just the opposite of that. This Court affirmed at 43 Fed Third 668, it's in our brief, affirmed the case, which it recognized and gave flavor to 103.2 as applying to unleased lands. We also made, Your Honor, a constitutional argument as applied, and that's spelled out. There is a case I'd like to call to the Court's attention, and I might submit it electronically. The Louisiana Supreme Court, in fact, Judge James Dennis of this Court, then owned the Louisiana Supreme Court, set forth the following rule of statutory interpretation. If there are two, I'll read it, but if there are two plausible interpretations, one of which is in accord with the state constitution, one of which is not, the Court must adopt that which is in accord with the constitution. That's the Honduras case, H-O-N-D-R-O-U-L-I-S. I will submit it 553 Southern 2nd 398. You're saying the constitutional problem is the title of the statute? Correct. Are there any cases you can point us to finding a statute unconstitutional in Louisiana for violating that requirement? I handled a case at the district court. It was called Coastal. I can provide that. It's Coastal v. Kinney, where an amendment to Article 76.1 of the Code of Civil Procedure was held unconstitutional for that very reason. And there are other cases. I can provide those. That is not a published decision, but it's been cited by Judge Tobias at the Fourth Circuit on numerous occasions. But I can provide those, Your Honor. But the rule by Judge Dennis at the Supreme Court, it is a basic rule of statutory interpretation that if a statute is susceptible of two constructions, one of which will render it constitutional and the other of which will render it unconstitutional or raise grave and doubtful constitutional questions, the Court will adopt the interpretation of the statute, which, without doing violence to its language, will maintain its constitutionality. But I will provide that. Your Honor, turning to the Risk Fee Act, which was enacted in 1984, its very purpose was to avoid what was called in the industry a free ride, back to that watchful wait where an operator is drilling a well and someone is sitting back waiting for the results only then to come forward. It introduced in 1984 a 100% risk charge on top of the statutory and jurisprudentially supported 100% recovery. So that's called a 200% recovery. And then later it was increased to a 200% risk charge. The interpretation urged by TDX would really defeat and fly in the face of the public policy announced in the Risk Fee Act. In 30-10, by allowing someone to sit back and gain an unfair advantage after the well is committed, completed. If a well is successful, is there still a risk? No, sir. The risk is an interim responsibility only paid out of production. And so if the well is a dry hole, the operator has assumed all those charges. There's no basis to impose the personal liability on the non-operator. But the statute clearly says the owners in the unit to whom notice provided may be sent or the owners of record as of the date on which the notice is sent. Well, that happened in this case because by the time the leases were recorded, those were the recognized owners within the meaning of that. It could not have sent the statute at the earlier date because it was unleased on the face of the public record. So we think that the court and we argued to Judge Hayes the bond decision of the Fifth Circuit, admittedly arising in a contractual context because it dealt with a joint operating agreement. The structure of the Risk Fee Act mirrors and follows as an analogy that of an operating agreement. And the reality is if the notice is given at a later date, the recipient has more information, not less. How can they be said to be prejudiced because they've observed the well, they know that it was successful, it certainly didn't blow out or some catastrophe did not occur. So it's just we think that the rationale embraced in the bond decision, that's page 32 of our brief, would come into play in this case and support the proposition that we've made. The amendments, I mean, the current statute clearly would cover TDX in this situation. It has that retrospective language. Doesn't that indicate the prior version didn't cover that? That's the proverbial remedial action. I would think, you know, you fix a broken sidewalk, you don't get blamed for it. I was involved in that legislation because it did fix the problem, but we think there's authority, as we put forth in our brief, that the court could have, perhaps using equity under Article IV of the Civil Code, could have allowed for the imposition of the risk fee. And understand, and I know you do, we're only talking about whether Chesapeake can recover the risk fee. Judge Hayes and no one's challenged that they do get their first 100% recovery out of production. It's the risk charge that we're talking about on top of that. So I believe I'm out of time, but if there are no other questions, and I will provide those authorities alluded to under Rule 28. Thank you, Your Honors. Let me clear up one issue. You asked about, there was a question about Touchstone. Touchstone was not a broker for TDX. Later on in time, Touchstone became a broker for TDX, but with respect to these leases, Touchstone bought those leases for their own account and then later came to TDX and sold them to them. So it was not acting on behalf of TDX. TDX didn't get these leases until October of 2011, which was several months after the well was drilled. There's no basis for saying that TDX gained this system. On the constitutional issue, two points. One is that in the notice of appeal filed by Chesapeake, they did not raise this issue. They did not file an appeal with respect to that portion of Judge Hayes' decision, so I'm not sure whether it's appropriate for a decision here. But in any event, even if you consider that issue, this statute is clearly constitutional. The only requirement is that it have one object. The object of this statute and the two parts of it is reporting by the operator, and every single piece of this statute from A to B to C to D to 103.2 is all talking about reporting by the operator. So there's no constitutional infirmity. I'm glad and disappointed that you asked the question about the logic behind giving greater protection to a truly unleased owner. And the truth of that is it's just the opposite. Both an unleased owner and a mineral lessee like TDX have a desperate need to know when the well pays out because it needs to hold the operator's feet to the fire and make sure that when it does pay out, you start paying me. So we need the cost information, but a mineral lessee needs it much more than an unleased owner. A mineral lessee like TDX has to pay royalties to its royalty owner. It can only do that if it knows how much production was sold, at what price it was sold, and how much was received. This well statute is not merely dealing with cost, but it's also talking about revenue, too. So when TDX doesn't get that cost information, it has to make guesses about what the production was and what the price was and what to pay its royalty owners. And it puts itself at the mercy of its royalty owners, who's now saying, you're not paying the royalties correctly and you're going to lose your lease as a result of that. So the logic is actually reversed. A person like TDX who has a lease has a much greater need for this information than an unleased owner. Now, here's the reason I'm disappointed that you asked that question. This court, in a case called Brandon Properties that we decided in our brief, it's an unpublished opinion, but it deals with this specific statute, 103.1 and 103.2. And what Brandon Properties teaches you is to just read the statute. Don't jump over to equity. It's not ambiguous. It didn't deal with this issue. It dealt with another issue in the statute. But the lesson is read the statute. If it makes sense to you, you're done. You don't need to go to equity and you don't need to go to logic. Just read the statute and apply it. Yes, sir. Okay. Thank you. Thank you all very much. What's the case that's pending before the Louisiana Supreme Court? It's called, it's cited in our briefs. It's 21XXI Oil and Gas v. Hillcourt. If you all would let us know what happens with that case, I don't know if we'll be coming out with an opinion before then or what we're going to do, but in the event we have not come out with an opinion, if you let us know as soon as you find out what the status of that case is before the Louisiana Supreme Court, we'll do just with the 28J? Yes, 28J. We'll do so, Your Honor. Again, I represent the applicant in that Supreme Court, so obviously I'll be notified, but we'll provide that to the court. Okay. Thank you, Your Honor. Thank you. And I think we'll take a short little break before we get to the next two cases.